# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL McGUIGAN,<br><br>    Plaintiff,<br><br>  *vs.*<br><br>CAROLYN W. COLVIN, Commissioner of Social Security,<br><br>    Defendant. | CAUSE NO. 1:13-cv-1539-DKL-JMS |

**ENTRY**

Plaintiff Michael McGuigan brings this suit for judicial review of the defendant Commissioner's decision denying his application for disability-insurance benefits under the Social Security Act. The parties consented to this magistrate judge conducting all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings. [Docs. 5 and 14.]

**Standards**

Judicial review of the Commissioner's factual findings is deferential: courts must affirm if her findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If

1

the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart,* 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 905. A person will be determined to be disabled only if her impairments "are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. §
1382c(a)(3)(B). The combined effect of all of an applicant's impairments shall be
considered throughout the disability determination process. 42 U.S.C. § 423(a)(3)(G).

The Social Security Administration ("SSA") has implemented these statutory
standards in part by prescribing a "five-step sequential evaluation process" for
determining disability. If disability status can be determined at any step in the sequence,
an application will not be reviewed further. At the first step, if the applicant is currently
engaged in substantial gainful activity, then she is not disabled. At the second step, if the
applicant's impairments are not severe, then she is not disabled. A severe impairment is
one that "significantly limits [a claimant's] physical or mental ability to do basic work
activities." Third, if the applicant's impairments, either singly or in combination, meet or
medically equal the criteria of any of the conditions included in the Listing of
Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, then the applicant is deemed
disabled. The Listing of Impairments are medical conditions defined by criteria that the
SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the applicant's
impairments do not satisfy a Listing, then her residual functional capacity ("RFC") will
be determined for the purposes of the next two steps. RFC is an applicant's ability to do
work on a regular and continuing basis despite his impairment-related physical and
mental limitations and is categorized as sedentary, light, medium, or heavy. At the fourth
step, if the applicant has the RFC to perform her past relevant work, then she is not

3

disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and her RFC, she will not be determined to be disabled if she can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. § 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at her assigned RFC level, then the grids may not be used to determine disability at that level; a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may still be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

**Background**

Mr. McGuigan's application for disability-insurance benefits was denied on initial and reconsideration reviews by the state agency. He requested and received a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration. That hearing occurred on June 12, 2012. (R. 33.) Mr. McGuigan was represented by a non-attorney representative at the hearing. (R. 86.) Mr. McGuigan and a vocational expert testified. The ALJ issued his decision denying the claim eight days later. When the

---

[1] By agreement with the SSA, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

Appeals Council denied Mr. McGuigan's request to review the denial, the ALJ's decision became the final decision of the Commissioner and the one that the Court reviews.

At step one, the ALJ found that Mr. McGuigan had not engaged in substantial gainful activity since his alleged onset date in January 2010. At step two, he found that Mr. McGuigan had the severe impairments of degenerative joint disease and osteoarthritis. At step three he found that Mr. Guigan did not have an impairment or combination of impairments, severe and non-severe, that met or equaled any of the Listings of Impairments. He specifically evaluated Listings 1.04, disorders of the spine, and Listing 1.02, major dysfunction of a joint(s) due to any cause.

For steps four and five, the ALJ determined Mr. McGuigan's residual functional capacity ("RFC"). As relevant to the present suit, the ALJ found that Mr. McGuigan retained the RFC to "stand, walk, and sit for 6 hours during an 8-hour workday" and "work should accommodate the use of a cane to and from the workstation." (R. 23.) At step four, the ALJ found, based on the testimony of the vocational expert, that the defined RFC permitted Mr. McGuigan to perform his past relevant work and, therefore, he was not disabled.

## Discussion

Mr. McGuigan argues three errors in the ALJ's decision.[2]

**1. Credibility.** After explaining the two-step process for evaluating a claimant's descriptions of subjective symptoms, (R. 23), and describing evidence in the record, (R. 23-25), the ALJ articulated his credibility findings and conclusions in the following way:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 24.)

> After consideration of the claimant's statements throughout the record, both documentary and oral, I find that the claimant is partially credible. While his medically determinable impairments could reasonably be expected to cause in general the alleged symptoms and limitations, the magnitude of the pain and the extent of those symptoms and limitations attested to by the claimant are not supported by medically acceptable clinical and diagnostic techniques. Further, there is insufficient objective medical evidence that the impairments are of such severity that they can reasonably be expected to give rise to the alleged level of pain and functional limitations.
>
> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> [quotation of the seven factors from S.S.R. 96-7p]

---

[2] The Court has reordered Mr. McGuigan's arguments.

> I find that the claimant's allegations are not credible to the degree that he would be precluded from all work-related activity. The claimant testified that [he] did not get a MRI since his alleged onset date despite his physician's instructions to do so because he could not afford the $1,500 cost. However, he indicated that he was smoking a pack of cigarettes at the cost of approximately $1,700 per year.
>
> Additionally, the claimant has received essentially routine and/or conservative treatment for his back pain, which is not the type of medical treatment one would expect for a totally disabled individual. The claimant testified that he has not had any back surgeries. Mr. Mc[G]uigan indicated to Dr. Boddu that he has not had any recent hospitalizations or emergency room visits (Ex. 5F/2).

(R. 26.) Mr. McGuigan argues that the ALJ's credibility determination is erroneous for two reasons.

**a. Failure to obtain a recommended MRI.** On a one-page "Established Patient Visit" form pertaining to a February 2011 visit, under the "Counseling/Care Plan" section, Dr. Neucks, Mr. McGuigan's treating rheumatologist, wrote "MRI — $ — he will [call?] CHI" as the fourth plan item, without further elaboration. There is no indication of which body part should be imaged and for what reason. (R. 224.)

Mr. McGuigan contends that the "primary reason" given by the ALJ for finding him not credible is that, despite his assertion that he could not afford an MRI recommended by Dr. Neucks, he continued to buy cigarettes, the annual cost of which would have allowed him to pay for the MRI. He argues that this was error for three reasons. First, the ALJ had no grounds for finding that quitting smoking would have improved his ability to work. Second, because an MRI is an imaging study for diagnosis, not a treatment that would have restored his ability to work, the fact that he did not obtain

8

the MRI cannot be interpreted as a failure or refusal to undergo recommended treatment. Third, the ALJ did not explain how he concluded that Mr. McGuigan would have been able to pay $1,500 for an MRI or that he spent approximately $1,700 annually on cigarettes. He contends that neither he nor the ALJ were in a position to know the "true cost" of an MRI and that, even if Mr. McGuigan's testimony of the $1,500 cost were accepted, he also testified that he recalled that the $1,500 cost was for "[t]he cheapest one . . . that didn't really cover all that much . . . ." (R. 48.)

In response, the Commissioner first points out that the ALJ did not find that Mr. McGuigan's continued smoking was contrary to any recommended treatment; rather, he found that Mr. McGuigan's continued spending for cigarettes was contrary to his claim of poverty as an excuse for not obtaining the recommended MRI. While the ultimate inference drawn by the ALJ was the same — Mr. McGuigan's allegations of symptom severity was not fully credible because, if they were, then he would have saved his cigarette money and spent it on obtaining the MRI recommended by Dr. Neucks — the difference does render moot any argument that the ALJ impermissibly assumed that quitting smoking, alone, would have restored Mr. McGuigan's health and his ability to work.

Mr. McGuigan is correct that the ALJ's expressed credibility inference is erroneous for two reasons. First, the ALJ failed to articulate his consideration of the addictive nature of tobacco, as explained by the United States Court of Appeals for the Seventh Circuit:

9

> . . . even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination.

*Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). The ALJ did not address the role of tobacco's addictive nature on whether Mr. McGuigan's failure to stop smoking indicated that his symptoms were not as severe as he alleged. The connection is even more tenuous in this case because Mr. McGuigan's smoking does not contribute to his alleged symptoms or functional limitations but relates only to his reason for not obtaining the recommended MRI.

Second, the ALJ cites no support for his implicit assumption that the MRI will lessen Mr. McGuigan's symptoms or reduce his functional limitations. As a diagnostic tool, an MRI alone will not have those effects and the ALJ points to no medical opinion in the record that the recommended MRI is reasonably expected to indicate or lead to any particular treatments that are likely to restore Mr. McGuigan's ability to work. "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. * * * If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ." 20 C.F.R. § 404.1530(a) and (b).

Mr. McGuigan's final argument, that the ALJ provided no basis for using $1,500 as the cost of the recommended MRI or $1,700 as the annual cost of his cigarettes, is unconvincing. The ALJ questioned Mr. McGuigan on these issues at the hearing:

> Q  How much did they tell you the MRI was going to cost?
>
> A  The cheapest one they said that didn't really cover all that much was I think was like $1500.
>
> Q  1500 bucks. What does that work out to? A pack a day for a year? Less than that?
>
> A  I don't know.
>
> Q  Well, a pack a day, 30 days, a pack's 5 bucks, $150 a day [Sic], times ten months -- $1500. You could afford a pack a day but you couldn't afford the MRI?
>
> A  No, sir.

(R. 48-49 (original brackets).)  Mr. McGuigan, who was represented by counsel during the hearing and is represented by counsel in this suit, did not suggest different figures at the hearing, did not ask leave to supplement the record with different figures, and does not suggest different figures now.[3]  Thus, he has not shown error in this part of the ALJ's credibility finding.

   **b.  Conservative, routine care.**  Mr. McGuigan also argues that the ALJ's characterization of his treatment as conservative and routine constitutes an

---

[3] The Commissioner also argues that the ALJ's discrediting of Mr. McGuigan's allegation of poverty is supported by the lack of evidence that he "ever sought free or sliding-scale healthcare" and by the evidence that he "sought and received a significant amount of treatment after January 2010, despite his testimony that he lost his insurance when he left his job as a bank teller."  (*Defendant's Memorandum in Support of Commissioner's Decision* [doc. 28] at 16.)  Because the ALJ did not provide either reason in support of his credibility determination and it is the ALJ's decision, not the Commissioner's arguments, that the Court reviews, these arguments are irrelevant in the error analysis.  And the Court is not convinced that they show that the ALJ's error was harmless, *i.e.*, that a remand is unlikely to change the decision.

impermissible lay medical judgment which the ALJ substituted for the expert medical judgment of his treating physicians and, for which, he had no expert medical support.

As quoted above, the ALJ's second reason for finding Mr. McGuigan's allegations of symptom and functional severity not fully credible is that he "received essentially routine and/or conservative treatment for his back pain, which is not the type of medical treatment one would expect for a totally disabled individual." The ALJ also noted that Mr. McGuigan has not had any back surgeries, recent hospitalizations, or emergency-room visits. (R. 26.) The Court agrees with Mr. McGuigan that, by not citing, or even alluding to, any expert medical evidence or opinion that non-routine or more aggressive treatments (*e.g.*, back surgeries, hospitalizations, or emergency-room visits) would have been prescribed, recommended, or expected if Mr. McGuigan's impairments and/or symptoms were as severe as he alleged, the ALJ was expressing a medical opinion for which he was not qualified.

The ALJ must reconsider and rearticulate his credibility determination, explaining **(1)** how the nature of the MRI recommended by Dr. Neucks supports the inference that Mr. McGuigan's failure to obtain it indicates that his symptoms and/or limitations are not as severe as he alleged; **(2)** the role of the addictive nature of tobacco in making that inference, *i.e.*, the effect of the addiction on Mr. McGuigan's failure to save his cigarette money for the MRI; and **(3)** how the routine and/or conservative nature of the treatment received by Mr. McGuigan supports the inference that his symptoms and/or limitations are not as severe as he alleged. The ALJ should consider whether he should obtain an

12

additional medical opinion regarding the nature of Mr. McGuigan's treatment in order to support any credibility inference based thereon and whether he should obtain additional information from Dr. Neucks regarding the nature and reasonably expected consequences of the MRI that he recommended.

**2. Full-time work.** Mr. McGuigan argues that the ALJ's RFC for full-time work is erroneous for three reasons. First, the ALJ did not, in fact, find him capable of performing full-time work. Specifically, he contends that the ALJ found that he had the RFC for standing, walking, and sitting for only six hours during an eight-hour workday, which does not constitute an RFC for work on a "regular and continuous basis" which is required for a finding of not-disabled. (*Memorandum in Support of Complaint* [doc. 23] ("*Brief in Support*") at 11.) While the ALJ wrote in his decision that Mr. McGuigan has the RFC to "stand, walk, and sit for 6 hours during an 8-hour workday," (R. 23), this was an unartful articulation of his actual finding, which is demonstrated by his hypothetical question to the vocational expert which described a person who "[c]an stand and walk for a total of six hours during the course of an eight hour day; sit for six hours during the course of an eight hour day," (R. 50). Thus, rather than find that Mr. McGuigan could stand, walk, and sit for a combined total of six hours, the ALJ separated the functions: he found that Mr. McGuigan could stand and walk for six hours, on the one hand, and that he could sit for six hours, on the other hand. This reading is confirmed by the ALJ's adoption of state-agency-physician Dr. Neal's RFC opinion which he recorded on a Physical Residual Functional Capacity Assessment form. Dr. Neal found that Mr.

13

McGuigan has the exertional capacity to "[s]tand and/or walk (with normal breaks) for a total of . . . about 6 hours in an 8-hour workday" and, separately, to "[s]it (with normal breaks) for a total of . . . about 6 hours in an 8-hour workday". (R. 26-27, 192.) Mr. McGuigan simply misconstrues the ALJ's finding.

Second, Mr. McGuigan argues that the ALJ's finding at step four that he could perform his past relevant work as a bank teller was erroneous because he performed that work part-time and part-time work is not substantial evidence that full-time work can be performed. He also faults the ALJ for failing to ask about the number of hours he worked as a teller or whether he frequently was absent.

A claimant will not be disabled if he is able to perform his past relevant work, either as he actually performed it or as it is generally performed in the national economy. 20 C.F.R. § 404.1560(b)(2). Asked by the ALJ at the hearing to classify Mr. McGuigan's work history, the vocational expert testified that his job as a bank teller was "light skilled work with an SVP[4] of 5, and that appears to be how he performed it." (R. 49.) The ALJ asked the vocational expert if there is any work that a person with Mr. McGuigan's age, education, work experience, and defined RFC could do, and the vocational expert answered that the position of bank teller could be performed. (R. 50-51.)

---

[4] The SVP is a "specific vocational preparation" rating that indicates how long it takes a worker to learn how to do a job at an average performance level. The Department of Labor defines an SVP for each of the occupations listed in the *Dictionary of Occupational Titles* ("*D.O.T.*"). SVPs have been correlated with the skill levels defined in 20 C.F.R. § 404.1568 for disability determinations. S.S.R. 00-4p (*e.g.*, skilled work corresponds to SVPs of 5 to 9 in the *D.O.T.*).

14

Thus, the ALJ did not use the fact that Mr. McGuigan performed part-time work in the past as evidence that he could currently perform full-time work. Rather, the ALJ obtained and relied upon an expert vocational opinion that Mr. McGuigan's vocational characteristics and RFC allow him to perform his past work as a bank teller as that job is generally performed in the national economy. Therefore, that Mr. McGuigan actually performed the job part-time does not show error.[5] In addition, the ALJ did not include "frequent absences" in his hypothetical to the vocational expert because he did not find that such a limitation was warranted, a finding that is confirmed by the ALJ's rejection of Mr. McGuigan's counsel's added limitation to the vocational expert of more than two days absence per month. (R. 52.) Moreover, Mr. McGuigan's does not provide any citation to record evidence that he had frequent absences while working as a bank teller and he does not make that assertion in his argument.

Mr. McGuigan's final argument is that the ALJ's RFC for full-time work is erroneous because he failed to "consider the issues that Mr. McGuigan would have with sustaining activity at that level over the course of a regular work week," failed to "provide the vocational expert with the complete picture of the claimant's functioning in the RFC," and "improperly discounted the effects of chronic pain and therefore does not represent the most that he would be capable of doing." (*Brief in Support* at 12.) The first

---

[5] The Court also notes that Mr. McGuigan does not assert that the ALJ was unaware that his work as a teller was performed part-time. A Disability Report completed by his representative, (R. 116-17), records that he worked 6 hours, five days a week as a teller, (R. 118). The same information appears in at least one other report in the record. (R. 125).

15

two are unspecific and undeveloped and the third merely restates Mr. McGuigan's credibility argument that has been addressed above.

Mr. McGuigan has not shown error in the full-time aspect of the ALJ's RFC finding.

**3. Dr. Neucks's opinion.** Mr. McGuigan argues, in one paragraph, (*Brief in Support* at 12), that the ALJ improperly discounted the opinion of Dr. Neucks, his treating rheumatologist. The ALJ articulated his evaluation of Dr. Neucks' opinion:

> Steven Neucks, M.D., opined on November 29, 2010 that the claimant's pain occasionally interferes with his ability to maintain attention and concentration. He further indicated that the claimant would require a 20-minute rest period per hour. Dr. Neucks indicated in a letter dated April 14, 2012 that his findings and diagnosis had not changed since November 2010. I am assigning little weight to Dr. Neucks['s] opinion because it is not supported by objective clinical findings and laboratory diagnostic techniques. Further, it is inconsistent with other substantial medical evidence of record.

(R. 27 (record citations omitted).) Earlier in his decision, the ALJ described the results of a physical examination of Mr. McGuigan performed by Dr. Neucks in July 2009:

> A physical examination was within normal limits. There were tender points in the posterior cervical or trapezius. Lumbosacral spine had some tenderness in the left SI joint. A straight leg raise was negative. Rheumatoid factor was negative. Dr. Neucks diagnosed the claimant with cervical spine pain with probable degenerative disc disease, degenerative arthritis, and myofascial pain. He instructed the claimant to continue treating with Celebrex.

(R. 24-25 (record citations omitted).)

The weight given to a treating-source medical opinion depends on the length of the treating relationship and frequency of examinations; the nature and extent of the treatment relationship in relationship to the claimant's impairment(s); the amount of relevant evidence or explanation presented in support of the opinion; the opinion's consistency with the record as a whole; whether the opinion pertains to medical issues within the source's area of specialty; and other factors (*e.g.*, the source's understanding of Social Security disability standards and familiarity with the other evidence in the record). 20 C.F.R. § 404.1527(c)(2)-(6). If the treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the Commissioner must give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2).

Mr. McGuigan argues that the ALJ's evaluation of Dr. Neucks's opinions was erroneous because **(1)** he did not identify which parts of Dr. Neucks's opinion were inconsistent with which "substantial medical evidence of record;" **(2)** Dr. Neucks's opinion is well supported by record evidence (*viz.*, an X-ray showing degenerative disc disease); and **(3)** his opinion is consistent with other evidence (*viz.*, Dr. Boddu's consultative examination and Mr. McGuigan's receiving injections for pain). Mr. McGuigan apparently contends that the ALJ should have given Dr. Neucks's opinion controlling weight in light of his long-term treating relationship with Mr. McGuigan.

Mr. McGuigan does not identify the specific opinions of Dr. Neucks to which he contends the ALJ should have given controlling weight or, at least, not "little weight,"

and he fails to explain how giving those specific opinions more, or controlling, weight would have affected the ALJ's disability decision. The Court will not make the arguments, identifications, or explanations for him. As his argument is stated, Mr. McGuigan is correct that the ALJ failed to identify the "substantial medical evidence of record" with which he found Dr. Neucks's opinion to be inconsistent. While the Commissioner attempts to fill this gap with her own identifications of inconsistent evidence, it is the ALJ's decision that the Court reviews, not the Commissioner's proffered amendments to that decison. Moreover, the Commissioner identifies only the ALJ's earlier recitation of some of the findings and opinions of Drs. Neucks, Boddu, Neal, and Whitley and mischaracterizes this recitation[6] as the ALJ's citation of "substantial evidence in support of his finding that Dr. Neucks' opinion was inconsistent with the other substantial medical evidence," (*Defendant's Memorandum in Support of Commissioner's Decision* [doc. 28] ("*Response*") at 11), but not only did the ALJ himself not connect any of this recited evidence to his evaluation of Dr. Neucks's opinion, he did not articulate any evaluation of it.

However, although the ALJ failed to identify record evidence with which unidentified opinions of Dr. Neucks were inconsistent, Mr. McGuigan does not challenge the ALJ's additional finding that Dr. Neucks's opinion "is not supported by objective clinical findings and laboratory diagnostic techniques." Therefore, Mr. McGuigan has not shown that the ALJ erred in not giving Dr. Neucks's opinions controlling weight

---

[6] The Commissioner also mischaracterizes this recitation as an analysis. (*Response* at 9-10.)

because, as noted above, both criteria are required for according controlling weight. 20 C.F.R. § 404.1527(c)(2) ("well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence . . . ."). In addition, it is evident that the two one-page questionnaires on which Dr. Neucks recorded his opinions, (R. 179, 180), contain no specifications of any supporting "medically acceptable clinical and laboratory diagnostic techniques."

There remains the question whether the ALJ erred in assigning Dr. Neucks's opinion "little weight" and the Court agrees that the ALJ failed to adequately articulate his rationale. As noted, he failed to identify inconsistent record evidence and the Commissioner cannot do it for him. In addition, while the ALJ is correct that Dr. Neucks's opinion fails to provide supporting clinical and laboratory diagnostic techniques, that is only one of the factors that an ALJ should consider in determining the weight to give non-controlling treating medical opinions. Although the Commissioner points to the normal and mild or moderate findings on Dr. Boddu's examination, the ALJ's finding that Mr. McGuigan received only routine and conservative treatments, and the ALJ's giving more credit to the contrary opinions of Dr. Boddu and the state-agency physicians, these again are evaluations that the ALJ must make and tie to his evaluation of Dr. Neucks's opinion (and the Court has already found wanting the ALJ's observation about routine and conservative treatments in relation to the credibility of Mr. McGuigan's symptom descriptions).

Mr. McGuigan has shown that the ALJ's articulation of his evaluation of Dr. Neucks's opinion was erroneous.

## Conclusion

The Commissioner's decision will be **REVERSED and REMANDED** for reconsideration and rearticulation consistent with the ruling made herein.

**DONE this date:** 02/25/2015

*[signature]*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.